You may begin. My name is Thomas Wickwire. I represent Forrest Kirst, the appellate in this case. Mr. Kirst is sitting to my right. This case is about a plane crash. Could you please speak into the microphone? We're having trouble hearing you. This case is about a plane crash, and there are two theories. The one adopted mostly by the defendants is that this pilot flew straight ahead into rising terrain and crashed into a mountain. And the weather at the time was 12,000 foot scattered clouds. The mountains were about 7000 feet high. The passing needs to clear is about 4700. The visibility is unrestricted. So oh, and it's about one or two in the afternoon. So this and he's flying north, northeast. So the sun would have been would not have been in his eyes. It would have been to his left quarter left. And as he flies towards the mountains, probably 15, 20 minutes worth, getting closer and closer. He just crashes right into the mountain, into rising terrain, they say. And this ignores facts that are clearly in the record and discovered by the FAA, but adopted. We're not reviewing the ALJ's determination. Right. The ALJ said you haven't proven to Mr. Kirst, you haven't proven that it wasn't negligence. Because I'm not ruling on the propeller blade and all that. But you have not carried your burden of showing it wasn't negligence. Well, it's mostly a strict liability case, not negligence case. OK, right. So we don't really it doesn't really matter which side the sun was on. Right. Whether it's negligence or not. Well, let me see if I know. Yeah. I mean, the problem is the district court found there was no nexus shown by Mr. Kirst between the alleged defective propeller and the cause of the crash. So perhaps you might address. Yes. The evidence of nexus. The way I view that is that is the law of strict product liability. And that requires that there be a defect and that there has to be a defect right from the left. The manufacturers that's in in all of the state's articulations of that test. So in Addison's case, that would have been three years. And however many 400 flight hours after it was sold to Mr. Curse. Yes. And Hartzell, we have no idea. 14 years ago is that if there is a defect, then the defect discovered at the time of the accident is computed to the manufacturer as of the time it left the manufacturer. And that that's what. But that's where the three year, three years and the hundreds of flight hours comes into play here because Mr. Curse and his maintenance people had had the propeller in their sole possession for that period of time, had checked the propeller on multiple occasions and never found any loose screws or anything like that. So, again, I ask, what evidence do you have to establish a nexus between a defective propeller and the cause of the crash? Well, first, Mr. Curse's mechanic did not check, inspect the propeller. Except to remove it, which takes one ball. Well, I thought I thought he testified that he had inspected the propeller in pre-flight on multiple occasions and apparently never noticed that anything was loose. Yes, but inspection in the pre-flight of a propeller does not involve looking or seeing whether the bolts that are holding the clamps that are holding the prop blades are torqued properly. He is not allowed to touch the prop that way because he doesn't have a prop shop license. So you're relying on what the doctrine of recip to locator. It must have been defective because there was a crash. I mean, I think you have to the district court thought you needed more. And I'm having a hard time figuring out why Judge Burgess wasn't correct in saying you needed more evidence than what you had used on discovery. Yes. Well, the district court said in his ruling that there was a suggestion that the bolt holding the clamp came off in flight. And I suggest that the court's use of the term suggestion is weak. Mr. Morse said there is conclusive evidence that the bolt came apart in flight before the crash. But I guess the big problem that I have, and I'm trying to get the same point that Judge Tallman is, that if I'm looking at used bolts as the defects you're alleging against heart cell, then I'm looking at what evidence did you introduce that the bolts were loose or that they were used when they left heart cell? That's the comments by the FAA inspectors that that's what they found. They found that somebody eyeballed the bolt on the ground and said it could have been used or it could have been forest monkeying around with it. That was his statement on the ground. But that didn't give any evidence about what was the condition of the bolts when they left heart cell, as Judge Smith said. They didn't just look at the bolts. They unscrewed them and found out that they were loose and could be unscrewed easily, which means they were not torqued and that they were used. So are you talking about your experts report? Because that isn't what I saw on the record for the FAA. Well, that's what is in the FAA report when they took apart the prop and looked at it. When they unscrewed the bolts that were remaining, they found them to be loose and used. What is your best evidence that the propeller left Audison with loose or unused bolts? It is Mr. Kurtz's declaration that in the time that he had it since. Mr. Kurtz doesn't know. Well, yes. He went out and inspected this. If you say he couldn't look at it or he couldn't do anything about it, that makes it more speculation. No. It means he didn't touch those bolts. So if they were found to be loose and one of them came loose, it was not because of anything he did. His declaration says that in the time, the three and a half years or so that he had that propeller, he did not look at or inspect or check the bolts that were holding the clamp that holds the prop blade because there was no reason to. He's not allowed to. And if he had any indication that those bolts were loose, he would have grounded the airplane and taken it off. He's not allowed to because that prop comes out of the shop with a service life of about 2,500 hours, and only a prop shop can start tampering with those bolts. And he said he did not tamper with them in the three and a half years. Therefore, I think that gets to the tort law that says a defect that is discovered after an accident and injury is imputed to the manufacturer as of the time it left the manufacturer. Counsel, am I correct that the propeller unit itself, if I'm using that term correctly, was damaged when the propeller blade contacted the ground when the plane crashed? There was significant damage done to the propeller unit. To the remaining blade. Right. But the other blade was never found. Right. And then we have the FAA inspector who made that comment about, you know, it was either, it could have been, we need to look into whether or not it was used or whether or not it was loose. But this is after the propeller has now been in contact with the ground and the inspector is trying to figure out what might have caused the crash. Oh, yes. But at that time, the other blade was still there, so they were the ones that removed the bolts holding it and found them to be loose. But the day after the crash, two inspectors went out there and made an exhaustive search for the other blade because they knew it was important and didn't find it. And then some weeks or months later, that seems to just drop out of significance, the fact that the blade is not there. Well, the FAA, and I realize this is a question of how much we can rely on the FAA's report, but the FAA, in essence, rejected that cause of the crash, did it not? It basically said the real cause of the crash here was pilot error. I don't think that's a correct reading of the FAA administrative here. Well, didn't they lift his license as a result of it? No, they lifted his license for flying lower than allowed when the 500-foot above ground. Okay. I mean, I refer to that as pilot error. I mean, it's not a mechanical problem. It's a problem occasioned by the operator, the pilot. Yes, they found that he was flying too low for conditions, and that's pilot error. Yeah. And of the two hearings, the probable cause hearing by the NTSB is not a due process hearing. No, I understand that. I understand that. And the other hearing where they take his license, the administrative law judge specifically said he is not finding whether the prop blade left or not. I saw that. I saw that. So if we're talking about corrosion, are you abandoning your corrosion argument as to product liability? As a direct cause, well, I never made that argument. I've said that when Hartzell discovered corrosion in this class of props, they required inspections, and the requirement of inspections instead of – they could have recalled the props, and their decision to require inspections, repeated inspections, is what caused the dealer, Otteson, to be removing and replacing, removing and placing these bolts and nuts that hold the clamp. So the fact that there was a service bulletin 292 that made clear that the propeller had never suffered from the corrosion problem that was found in other propellers, does that not end your argument? No, because for the first seven years, service bulletin 255 applied, and it required repeated – Well, the honest truth is 255 was wrong. That's what 292 said. But for the first seven years, it required the dealers to inspect these props repeatedly. I thought that was only after a certain number of hours flown, which this claim didn't meet. Is that wrong? Yes, I think that's incorrect. I thought they said it was only after like – it was like 1,000 hours or something like that, and this was only 400 in their service bulletin. Right. Well, 255 required it with over 1,000 flight hours of use. So it wouldn't have been required for this plane since it wasn't more than 400. Even if it was 252. I disagree with the reading of that. That's what Otteson has contended. But I think a reading of that bulletin says that there has to be inspections looking for corrosion, even when the prop is in the possession of the dealer. And there's another set of inspections required for a prop that is in storage longer than two years. So either way you look at it, Otteson had to do inspections, and the inspections wouldn't have happened if Hartzell had recalled the prop, which was an option they took, a very expensive option. But they decided to manage their risk by leaving these props with the dealers and in service and hoping to catch the corrosion before it happened. But I do admit that corrosion is not – It really seems to me that you really left what this service bulletin even says because the service bulletin, as Judge Ikuda points out, only requires the inspections with over 1,000 flight hours, which this plane didn't have. And then the service bulletin further said that disassembly was not required, right? For some of the inspections, yes. Well, for any inspection that had to do with this, if you will, corrosion. Well, that's – well, I tried to – I mean, that's what's in the – I'm just reading 255, and I'm reading what it says, and it doesn't seem to me that it would have applied here at all. Well, I wanted to see how much – how Otteson interpreted those bulletins and what they actually did for inspection, either for long-term storage or to look for corrosion. And I couldn't get anywhere because they destroyed their records. And so all they've – what is clear is that they switched blades, unbeknownst to Mr. Kirst, which would have prevented him from buying this prop. And in switching the blades, they would have to have taken the bolts off and put them back on. And so I don't know which – whether it was an inspection or the switching of the blades that caused the end result when it left Otteson for Kirst to be the extant facts, but whatever was the last time they put those – the clamp bolts on, they were loose. You want to save some time for rebuttal? Oh, yes. Well, one more thing. I want to talk about Mr. Morse. You have a minute and 20 seconds left. Mr. Morse works for Lockheed and Boeing and major airlines and the U.S. military and the Royal Air Force. He gets his work from them. They want to know what happened. They don't care who wins. So his report, I think, when he says conclusive evidence that this prop bolt left and the sequence would be the blade left, too, is to be viewed not as an advocate taking a position but as somebody looking to get to the truth and the facts. Thank you. Okay. Thank you. May it please the Court, my name is Mark Wilhelm. I'm the attorney for Hartzell Propeller. I'm going to share my time with Ben West, who's the attorney for Otteson. I'm going to try to sit down about seven or eight minutes into my argument. Okay. Please watch the clock. This is just simply a case of, you know, on a court-granted summary judgment about whether a plaintiff was able to meet the burden of proof as defined by the Ninth Circuit. I'm going to ñ there's the Darden Restaurant claim at 213 F. 3rd, 474. And it's said there that in order to overcome summary judgment that a plaintiff or the party without the plaintiff has to produce enough evidence to get past a directed verdict. This is not what happened here. We have a lot of speculation. We have a lot of convoluted arguments about repeat inspections due to corrosion. The theories are not the evidence, so the Court needs to look at what the evidence was. Hartzell sold the propeller to Otteson in 2000. And Otteson kept it in storage for 11 years. And then prior to the sale, it pulled out the storage. It conducted a ñ what they call a long-term storage inspection. They took off the two propeller clamps under the bolts, switched out the propellers, refastened the clamps, and did other service on this propeller. Now, just for the background of the Court, there's a propeller hub and the propeller blades. And the clamps hold the blades together with the hub, and they're connected by bolts. And those records still exist, do they not, attesting that they were done? This work that Hartzell did, is there any contemporaneous work record in the manufacturer's files? The manufacturer has the record of releasing the propeller in 2000 and certifying it was airworthy. Okay. They had no ñ And then from when Otteson retrieved it from long-term storage, are those records lost now? There's one record, which is called an 8130. Otteson purged its other records under routine policies three years after the sale of the propeller, as they do with all their maintenance records, so that we have some records. We don't have all the records just because of routine purging practices by Otteson. So the answer to her question is those records are not available. What ñ we do not have all the records as to what Otteson did, so we are relying on the testimony of Otteson's manager, Roy Henderson, which is in the record as to Otteson's practices and procedures. What happened here is we had the NTSB investigate the accident, and if you look at the supplementary extra record, the 130 and 131, there was a GPS aboard Mr. Kirst's aircraft. That shows, in fact, Mr. Kirst did fly directly to the side of the mountain because he entered a mountain pass at too low an altitude. Mr. Kirst then, after he learned that the propeller blade was lost, switched his story for the third time and said, well, it must have been a lost propeller. So Hartzell moved for severed judgment and said, you know, we want you to prove it up. Mr. Kirst couldn't do that. The bolt, which he claims was loose, was changed out by Otteson. They have testified they bolted it on correctly to the proper torque. Certainly this is not something that Hartzell should be held responsible for where a service dealer has conducted a service on an item after it leaves their possession. We've heard a lot about corrosion. I think the Court's already aware from reading Service Bulletin 255 that the corrosion was ñ well, he's admitted that corrosion is not the cause of the accident, and Service Bulletin 255 did not require any inspection. So the whole corrosion argument is simply here to plain paint Hartzell with a black brush and black paint on something that's entirely irrelevant here. Given that it didn't even require that the bolts be taken apart, that somehow this caused there to be used bolts when it was inspected is entirely irrelevant. Nor does Mr. Kirst even provide evidence that it was improper to use used bolts or that used bolts would have failed when new bolts wouldn't fail. And so there's an entire failure of proof here all along. Finally, there's the claim of negligent supervision. Mr. Kirst doesn't point to a single or negligent misrepresentation. It's really two sides of the same coin. But Mr. Kirst doesn't really point to a single item that we put in our website that we didn't do. We supervised Edison to make sure it had properly trained mechanics. We audited to assure that the mechanics were properly trained and qualified. They were. The audit found that to be the case. The issue here, whether a bolt was properly tightened, is certainly not something that Hartzell needed to supervise. It's a routine thing that Edison does all the time and, you know, that they do correctly all the time. So we're, again, the negligent supervision thing. There's no connection between anything on our website and this accident. Finally, I want to just say in the alternative, we have our argument regarding collateral estoppel. The FAA took a license accident against Mr. Kirst. There was a hearing held, and the NTSB supplies the judge for where there's a dispute between the FAA and an airman. I thought the ALJ expressly didn't rule on the propeller issue, on the mechanical failure issue. I'm sorry. The ALJ expressly did not reach or did not rule on the mechanical failure issue. I disagree with what the ALJ did is he rejected Mr. Kirst's affirmative defense. Mr. Kirst had the affirmative defense of proving that this wasn't caused by his bad airworthiness, his bad airmanship, but he had approved that the accident, in fact, was caused by the propeller. The court held that Mr. Kirst did not meet that burden of proof. So it's, you know, it was 50-50 or less. To get to prevail here, Mr. Kirst needs to prove 51 percent likelihood that the propeller failed. The court held he did not prove that, and therefore the same burden of proof applied in both cases, and that's why we are arguing that collateral estoppel applies. Thank you. Thank you. Good morning, and may it please the Court. My name is Ben West, and I'm here on behalf of the Otterson Propeller and Accessories and the Otterson Family Foundation. The key case law dealing with these claims comes from this court and says that mere allegation and speculation do not create a factual dispute for purposes of summary judgment. And that's in Nelson v. Pima Community College. And the court has also stated, conclusory speculative testimony in affidavits and moving papers is not sufficient to raise genuine issues of material fact. And Sorameek and V. Thrifty Payless. I'd like to address some of the issues that have been raised here regarding Otterson, which is an FAA repair station located in Arizona. The work performed by Otterson, just as it asked about the records, records are required to be kept by the FAA for a period of two years. Otterson has been in business since 1955, family owned and operated. And as you can imagine, they don't have the capacity to keep records beyond the FAA required period. So there are some records that aren't in existence regarding the propellers simply because they're not required to keep those, not because of any malicious intent to destroy records. Okay, so that gets you around the adverse inference from spoliation of evidence. But what do you have to rely on then? Just the testimony of Otterson employees as to what did or did not happen to the propeller for the 11 years that it was in their custody? Well, to some extent, yes. But then the key record is going to be the FAA 8130 form that was issued with the propeller when it was sold to Mr. Kirst. And that form specifies that Otterson followed the manufacturer's manual in overhauling and preparing the propeller for service. And so that is the record that certifies that the specifications established by Hartzell were followed by Otterson. Did you have a witness who actually performed the work, or was it just a practices and procedures type witness, that this is what we usually do? The deponent for Otterson, Mr. Roy Henderson, was involved with the preparation of the propeller and in his deposition did testify regarding that and inspected it. As I understand, the facts are Otterson assembles this propeller and sells it, and Otterson did not install it, right? Correct. So then after that, Kirst had the plane for three years. Correct. And during this three-year period of time, Kirst conducts necessary repairs and inspections, is that right? That is correct, Your Honor. He also performed a 100-hour flight inspection? That is correct. Annual inspection? That is correct. Pre-flight inspections? That is correct, even two on the day of the incident. Two pre-flight inspections the day of the crash? Yes. And he says that bolts never appeared loose at any of those inspections? That is correct. So the first time anybody says they looked loose is after the crash? That is correct. And as a point of clarification, Your Honor, there is reference in the record to little marks regarding checking for looseness, and so when the propeller blade is attached to the hub, which is the portion that holds the blade essentially to the airplane, when the installer does that, they will take paint and mark a stripe that runs from the propeller blade to the hub where it's attached. And when those stripes line up from the point of installation, that means that the propeller is in line. And if that propeller were to come loose, those marks would not match any longer. They would be offset. And the record clearly indicates from Mr. Kearse that those marks were straight, even during the pre-flight on the day of the incident, evidenting no looseness of the propeller up until the point of the incident. There was no evidence of looseness. To Mr. Wickwire's point of the district court ruling that there was suggestion that the propeller came off, that was made only in the terms of viewing the facts in the best possible light for the plaintiff. The district court was not making a ruling there that the propeller was coming off. What about Mr. Morse's expert report? I mean, he does opine that the lost propeller was the cause of the crash, does he not? He does, Your Honor, but there is nothing that would tie that back to, even if taken as true, nothing that would tie that back to the condition of the propeller at the time that it left the Otterson facility. There is nothing but speculation that would show there was any looseness of bolts or any problems with the clamps at the time that it left. So Otterson didn't do any check inspections or anything after the propeller was sold to Mr. Kearse? That's correct. When that propeller left the Otterson facility, when it was sold to Mr. Kearse, Otterson never saw the propeller again. As far as the record indicates, the only individuals who had contact with the propeller were Mr. Kearse and his mechanic. But Otterson had zero control or possession of the propeller after it left its facility three years and 400-some-odd flight hours before the incident. I think we have your argument. Thank you. We have a few seconds for rebuttal. Otterson said inconsistent things about the bolts. First they were asked by the FAA, what about the used bolts and nuts? And their answer was, oh, those would have been original installed by Hartzell. Then when Hartzell was deposed, they said, oh, no, we do not put used bolts on new propellers. And then Otterson changed it. Oh, in that case, they were new. So flip-flopping back and forth means we've got used bolts and loose bolts on here. And as to the 347 hours of flight hours in three-something years, the prop is supposed to be certified and good for 2,500 hours. It took 347 hours for the loose nut to gradually unwind until it came apart. But if that happened, wouldn't the maintenance stripe not line up? Not until the bolt comes loose. Well, now I'm not sure I understand what you just said. Because you said that it occurred over a long period of time. But if that's so, then wouldn't the maintenance stripe no longer be uniform? No, the clamp is about four inches. It's got two bolts on the top, two bolts on the bottom. As long as they're all there, the blade is not going to rotate in the clamp. The bolt has to come loose. So you're saying they could come loose, but the stripe would still be matched up. It would be matched up until the bolt leaves and the clamp spreads and the prop blade starts wobbling and breaks and flies off. All right. You're over time. Thank you for that. Thank you. We thank both sides for their argument. The case of Kerst v. Otteson Propeller and Accessories is submitted. And we're adjourned for this session and for the week. All rise. This court for this session stands adjourned.
judges: Tallman, Ikuta, N.R. Smith